# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs February 23, 2010 at Knoxville

## STATE OF TENNESSEE v. WILLIE EARL BROWN, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2006-C-1909    Steve Dozier, Judge**

---

**No. M2009-00505-CCA-R3-CD - Filed November 5, 2010**

---

Following a jury trial, the Defendant was convicted of 11 counts of rape of a child, a Class A felony, and was sentenced to an effective sentence of 74 years. In this appeal as of right, the Defendant contends that (1) the evidence was insufficient to sustain his convictions of rape of a child in counts 13 and 14; (2) the Defendant's conviction of rape of a child in counts 4 and 5 violated the principles of double jeopardy; (3) the trial court erred in admitting evidence of uncharged conduct in violation of Tennessee Rule of Evidence 404(b); (4) the trial court erred in refusing to allow cross-examination of the victim regarding her pregnancy; (5) the trial court erred in admitting statements from a clinical social worker that were not obtained for the purpose of medical diagnosis and treatment; and (6) the trial court erred in sentencing the Defendant. Following our review, we conclude that the trial court erroneously admitted evidence of the Defendant's uncharged sexual conduct with the victim and that this error was not harmless. Accordingly, we reverse the judgments of the trial court and remand the Defendant's case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Reversed; Case Remanded.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Laura Clift, District Public Defender; and Jeffrey A. DeVasher, Katie Bottom, and Aimee Solway, Assistant Public Defenders, attorneys for appellant, Willie Earl Brown, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Sharon Reddick and Anton Jackson, Assistant District Attorneys General, attorneys for appellee, State of Tennessee.

# OPINION

Ferrah Melissa Brown, the victim's mother, testified that she has three children, A.G., C.B. and T.B.[1] A.G. is Ferrah Brown's oldest child and was born in 1994. A.G.'s father died when she was very young, and Ferrah Brown married Charlie Brown, Sr. The Defendant is Charlie Brown, Sr.'s brother and is married to a woman named Patricia Lynn Brown.

Shortly after Ferrah Brown and Charlie Brown, Sr. were married, they moved to Nashville, Tennessee. The Defendant and Patricia Brown moved to Nashville and lived with them a few months later. They stayed with them for eight months and then moved to a house approximately two minutes away from them. Ferrah Brown and her family moved frequently, and the Defendant and Patricia Brown always moved to an apartment or house near them.

The periods of A.G.'s alleged abuse occurred when she was living in a trailer park in Lebanon, Tennessee (Wilson County); when she was living in Nashville, Tennessee (Davidson County) in an apartment complex named Village Trail; and when the Defendant and Patricia Brown moved to Lavergne, Tennessee (Rutherford County). Ferrah Brown confirmed the dates and various addresses during the time-frame of the alleged abuse. The abuse charged in these indictments related to incidents occurring in Davidson County.

Ferrah Brown and Charlie Brown, Sr. separated in 2004, and while they were separated, the Defendant and Patricia Brown helped take care of the children during the day. This occurred when Ferrah Brown was living in Village Trail and the Defendant lived one street behind her on Brickmont Drive. Ferrah Brown stated that the Defendant and Patricia Brown "put the kids on the bus and g[o]t them off the bus." "[T]hey also came and got [the children] on the weekends." The children, A.G. and C.B., also went with the Defendant, who was a truck driver, on trips for work. A.G. went on at least one trip alone with the Defendant. At some point, the Defendant and Patricia Brown moved to Lavergne, Tennessee. While in Lavergne, the Defendant picked up the children and took them to their house in Lavergne, where the children would "see them like every weekend."

In Summer 2005, Ferrah Brown took the children with her to visit her mother, Dorothy Mae Anderson, and sister, Eboni Anderson, in Louisville, Mississippi. While in Mississippi, A.G. decided that she wanted to stay with Dorothy Anderson and go to school in Mississippi. When Ferrah Brown told the Defendant that A.G. had stayed in Mississippi, the Defendant "got kind of upset about it."

---

[1]This court refers to rape victims by their initials. We will also refer to her siblings by their initials in order to provide further anonymity.

On cross-examination, Ferrah Brown admitted that while she was separated from Charlie Brown, Sr. for approximately two years, she lived next to Lekecia Anderson, who also cared for her children. The children spent the night at Lekecia Anderson's house "[e]very now and then." She also admitted that on one occasion, A.G. and the other children stayed with James Miller, a man she was dating, while she "went to the store." On redirect examination, she stated that A.G. had never accused anyone except the Defendant of molesting her.

A.G., who was 14 at the time of the trial, testified that she and her brothers called the Defendant "June Bug" or "June" and that she referred to Patricia Brown as "Lynn." She spent a lot of time with the Defendant and his wife because "they wanted [her and her brothers] to come over to their house all the time." When she was approximately eight or nine, she went more often. She said that the Defendant first touched her "private parts" when she was five. This occurred in the guest bedroom in the Defendant's "trailer" in Lebanon, Tennessee.

A.G. testified that the Defendant also sexually penetrated her when she rode in the Defendant's semi-truck and went on trips with him for his job. She remembered that she went on overnight trips with the Defendant, but she could not remember where they went. She did remember that they went outside of Nashville. While on a trip with the Defendant, the Defendant told A.G. "to pull [her] clothes off." She then "laid on the bed[,] he stuck his penis in [her,] and he started to . . . have sex with [her]." The Defendant also raped her when others, C.B. and Patricia Brown, were riding in the truck with them.

Relevant to the indicted offenses, A.G. identified a picture of the Defendant's duplex on Brickmont Drive as "Lynn and June's house." She lived "right down the street" from the Defendant's house. She and her brothers went to the Defendant's house "like all the time." She spent more time with the Defendant and Lynn at the house on Brickmont Drive than she did when he lived in any other house. When she was at the house, "Lynn wouldn't stay that much" because Lynn would "go get something from like a store." A.G. said that the Defendant sexually penetrated her while she visited him at the house on Brickmont Drive but that he did not perform sexual acts with her each time she went to the house. Among other instances of abuse, the Defendant touched her vagina with "[v]ibrators and his fingers." The Defendant touched A.G.'s vagina with his fingers "two times."

When the Defendant touched A.G., she was usually alone with the Defendant at his house. She would be watching television in the living room, and the Defendant would tell her to come back to his room. She knew that the Defendant wanted "[t]o have sex" with her "[b]ecause he did it before, so [she] knew it was going to happen again." When she would arrive in the bedroom, the Defendant would tell her to "pull [her] clothes down." The

Defendant did not take his clothes off, and she was only told to take off her "panties." After she lay on the bed, the Defendant would "pull[] his penis out of his zipper part" and "st[i]ck his penis in [her]." While he was sexually penetrating her, the Defendant would be "standing up in front of [her]" as she was lying on her back. A.G. first stated that this happened so many times that she could not count, but she stated that this happened "about ten [or] eleven times."

A.G. testified that the Defendant also "tried to put his penis in [her] butt." She was unable to remember the day that this happened, but she did remember that the Defendant "had some [O]rajel" and that "he tried to put the [O]rajel up [her] butt" before he tried to penetrate her anus. "[H]e told [her] to turn over[,] and he tried to put the [O]rajel up [her] butt. And then he tried to stick his penis in [her] butt but it wouldn't go [because] it was hurting." The Defendant's penis "went [inside] a little bit." When A.G. "told him to stop," the Defendant stopped. The Defendant then "went back to the front of [her] and then started from there again." This happened in the Defendant's bedroom while she was "[o]n the bed."

On other occasions, the Defendant also placed his penis in A.G.'s mouth when she was in the Defendant's bedroom. When this happened, A.G. would "be on [her] knees." The Defendant "would sit on the bed and pull his [penis] out and make [her] suck [his penis]." The Defendant would give her "signals" indicating that he wanted her to perform fellatio. He made her do this "[a]bout two times." When this happened, a "white and kind of creamy-looking" substance came out of his penis. The Defendant would use a towel to "catch it," but some of the substance also came out in A.G.'s mouth. A.G. said that the substance tasted "[n]asty" and that she "would go to the bathroom and spit it out" so that she did not swallow the substance.

A.G. also testified that the Defendant put his fingers in her vagina. He put his fingers in her vagina "[m]aybe two times" when she was on the bed in the Defendant's bedroom in the house on Brickmont Drive. He put his fingers in her vagina "[r]ight before" he put his penis in her vagina. She said that when he put his fingers in her vagina, it felt "like he was cutting [her] because he had long nails." She said that it felt like "he was cutting my tissues and stuff in the inside."

A.G. stated that the Defendant also had sex with her in the living room in the house on Brickmont Drive right before he moved to Lavergne. This occurred at night when the electricity was turned off at the house. The Defendant "brought [her] back to their house," and "it was real cold and there wasn't no furniture." The Defendant "put [her] on the floor and . . . told [her] to take [her] pants off[,] and he put his penis inside [her vagina]." When they were finished having sex, the Defendant "got up and [she saw] white stuff and then [the Defendant] went to the bathroom and . . . got [the white stuff] out, in the toilet."

-4-

She said that the Defendant also "stuck his penis in [her] vagina" in the bathroom on the toilet when they were alone at the house on Brickmont Drive. The Defendant "was sitting down and [she] was on top of him." The toilet seat was down. A.G. was not wearing any pants. The Defendant "had his clothes on but he unzipped the part to pull out his [penis]."

A.G. also said that the Defendant touched her with a vibrator.[2] He "would lay the blue towel down" and "would make [her] get on the blue towel so . . . the stuff wouldn't get on the bed" when he used the vibrator. A.G. described the vibrator as "pink and red" and "long and it had like a thumb on the end, kinda like a long finger." A.G. stated that she knew the word vibrator because she "just knew" and that she first saw a vibrator when the Defendant moved into the house on Brickmont Drive. The Defendant was the only one who ever showed her a vibrator. She said that the vibrator "made like a whummmmmmmmmmmmmm" sound. The Defendant did not put the vibrator in her vagina, but he placed the vibrator on her "feeling thing," which is "the thing that's on top" and near her "private part." A.G. then identified a photograph of the vibrator.

A.G. testified that when the Defendant sexually penetrated her, it hurt "[m]ost of the time." However, she never told the Defendant to stop having sex with her. The Defendant told her, "[D]on't tell nobody or we're both going to get in trouble." When he told her that she would get into trouble because they were having sex, she thought "[the Defendant] might be right . . . [that she] might really get in trouble."

A.G. stated that C.B. and Patricia Brown saw the Defendant and the victim performing sexual acts together. Patricia Brown saw A.G. performing oral sex on the Defendant before the Defendant moved to the house on Brickmont Drive. After Patricia Brown saw what was happening, the Defendant and Patricia Brown argued. The Defendant apologized to A.G. and said that he would not have sex with her again. However, he sexually penetrated her again in the house on Brickmont Drive.

When the Defendant moved to Lavergne (Rutherford County), he continued to have sex with her and use the vibrator with her. While in Rutherford County, C.B. walked in the Defendant's bedroom when the Defendant "was on top of [her] with his penis inside [her vagina]." The Defendant told C.B. to leave.

A.G. decided to stay with her grandmother because she was "tired" of "[the Defendant] having sex with [her]." After she moved to Mississippi, the Defendant called her

---

[2]Connie Pegram, who was a detective with the City of Lavergne in 2005, found a red vibrator while participating in the execution of a search warrant of the Defendant's house in Lavergne.

"[l]ike every other day" and asked if she had told anybody about their sexual relationship. When she finally told her grandmother about it, she was taken to a doctor in Mississippi. She did not tell anybody about the abuse until she told her grandmother because she was "scared" that she would "get in trouble."

On cross-examination, A.G. admitted that she had not mentioned the Defendant's use of Orajel until "recently" because "some of this stuff just came back to [her]." She also admitted that until recently, she had not talked about two of the rape allegations – the incident in the living room or the incident in the bathroom. On redirect examination, A.G. stated that she mentioned the Orajel when she was asked if the Defendant used anything when having sex with her. However, nobody had ever asked her about having sex in the bathroom until trial.

C.B., who was ten years old at the time of trial, testified that A.G. is his sister. He said that he spent time at the Defendant's house when he "lived down the street from them, like across the street." Sometimes the Defendant would play with him, but other times, the Defendant would be "watching [television] in his room." When visiting at the Defendant's house, he saw the Defendant put his hands on his sister's "[f]ront or back" when he went to the Defendant's room to ask for something. He walked in the room and saw A.G. "[l]aying on the bed," and the Defendant told him "to go downstairs."[3]

He stated that he also saw the Defendant touching A.G. in the Defendant's truck when they were on trips. He said that he "saw some of [the Defendant's] private parts somewhere on her." He said that the Defendant "did [his] sister from the front." He then demonstrated what he observed using two stuffed bears. He also identified a picture that he drew of the Defendant's truck and then pointed to where he was when he saw the Defendant with A.G.

C.B. testified that he also visited the Defendant when the Defendant moved to the house in Rutherford County. The Defendant's house had an upstairs area and a downstairs area. He and A.G. stayed the night at the Defendant's house with the Defendant and Patricia Brown. While at the house in Rutherford County, he saw the Defendant on the bed with his sister. He saw the Defendant laying behind A.G. on the bed. He used the bears again to demonstrate what he observed. He also saw "nasty movies" while at the Defendant's house.

He stated that he never told anyone about what he observed because he was scared that "June would get [him]." He testified that he remembered a time in which Patricia Brown

---

[3]From the progression of the testimony it appears that C.B. is referring to an incident that happened at the house on Brickmont Drive; however, he testified that the house in Lavergne had an upstairs, and the photograph of the house on Brickmont Drive portrays a single-level home.

came home when he, A.G., and the Defendant were at the house. He was in the living room, and A.G. and the Defendant were in the bedroom. When Patricia Brown opened the door to the bedroom, she "started to cry."[4]

On cross-examination, he said that the Defendant and A.G. both had their clothes on when he saw them in the truck and in the bedroom at the houses in Davidson and Rutherford Counties. He said that Patricia Brown was not home either time that he saw the Defendant with A.G. in each house. When he saw the Defendant with A.G. at the house in Davidson County, the Defendant was standing with his hands "beside her stomach" while A.G. was lying on the bed with her clothes on.

Eboni and Dorothy Anderson, the victim's aunt and grandmother, testified that the Defendant called looking for A.G. and that they allowed the Defendant to talk with A.G. when he called. The Defendant had never called either of them before A.G. came to Mississippi. Eboni Anderson said that the Defendant called A.G. "[o]ne to three times a day." She also said that the Defendant called her after A.G. had been staying there for two weeks and asked her why Dorothy Anderson had accused him of "hitting on [the victim]." The Defendant denied touching A.G., and she told him that she would "get to the bottom of it and see what's going on." On cross-examination, Eboni Anderson said that the Defendant called A.G. from "five or six" different numbers and that the Defendant always identified himself.

Dorothy Anderson testified that when A.G. began to receive a lot of telephone calls from the Defendant, she became worried. She told A.G. that the Defendant "had no business calling her like that." Dorothy Anderson called the last number that the Defendant had called from, which happened to be Lekecia Anderson's telephone. Nobody answered the telephone, so she left the Defendant a message. In her message, she told the Defendant that "he had no business calling [A.G.]" and that the only reason for him to call her would be "if there was something funny going on." The Defendant returned her message and "tried to convince [her] that he would never touch [A.G. or] hurt her, in any kind of way."

After speaking with the Defendant, she talked to A.G., who told her what had happened. A.G. told her that she "knew this day was coming" because she "prayed to God to help [her] because [she] wanted to be like normal children." Dorothy Anderson then took her for a medical examination and told Ferrah Brown about the abuse.

---

[4]It is not clear from C.B.'s testimony when and in which house this actually occurred; however, A.G. testified regarding a similar instance in which Patricia Brown observed the Defendant with A.G. prior to the instances of abuse that occurred in the house on Brickmont Drive.

On cross-examination, Dorothy Anderson said that A.G. stayed with her during the week but sometimes went to visit Eboni Anderson or her paternal grandmother. She gave the Defendant Eboni Anderson's telephone number the first time the Defendant called for A.G. when A.G. was at Eboni Anderson's house. She was unsure about who was calling at that time, but she gave him the number anyway.

Detective Robert Carrigan of the Metro Police Department was responsible for "investigating the portion of offenses that were alleged to have occurred in Nashville" even though "similar type events" occurred in other counties. He received a medical examination report from a local hospital in Mississippi, and after reading the report, he determined that A.G. should be examined at a hospital in Nashville and should undergo a forensic interview. After A.G. was interviewed in Nashville, he was able to talk with Ferrah Brown about the locations and descriptions of houses in order to determine when A.G. may have been molested. Taking this information, he was able to obtain records from the Nashville Electric Service to confirm the dates in which the Browns lived in certain locations. A.G. also identified C.B. as a potential witness, and someone identified Patricia Brown as another potential witness. The Department of Children's Services interviewed C.B., but Patricia Brown refused to talk with Detective Carrigan regarding the case. On cross-examination, Detective Carrigan said that the report from Mississippi was not "very detailed" but admitted that he was not present for that interview.

Lisa Dupree of Our Kids Center at Nashville General Hospital (Our Kids) testified that she is a licensed clinical social worker and that she interviewed A.G., who appeared "anxious" during the interview. A.G. had difficulty understanding her questions but told her that when she visited the Defendant with her brothers, "Uncle June" started "touching" her. A.G. said that the Defendant touched her more than one time and that he first started touching her when she was five years old. A.G. could not remember what happened when she was five, but she said that the Defendant "told her about it." A.G. remembered that the last time he touched her occurred before she went to Mississippi. A.G. said, "When I went down there he would always make his wife go away and then he would [have sex with me]." After he put his penis in her vagina, he would take "it out real fast and rush[] to the bathroom to get that stuff out." A.G. also told her that the Defendant put his penis in her mouth and "tried to stick it in [her] butt." A.G. further stated that the Defendant "touched her butt but it didn't get in." After interviewing A.G., Ms. Dupree provided all of the information to the nurse practitioner, Sue Ross, who conducted A.G.'s physical exam.

On cross-examination, Ms. Dupree clarified that her notes reflected that A.G. had "significant difficulty understanding" the questions. She insisted that her examination was not a forensic examination and that she specifically does not address certain issues when interviewing victims because she was not conducting a forensic examination.

-8-

On redirect examination, Ms. Dupree said that her interview was designed to obtain information to conduct a thorough medical examination. She does not ask the victims how many times they have been touched in certain areas, she simply determines when and where the victim had been touched in order to facilitate the medical examination.

Sue Ross, a Pediatric Nurse Practitioner at Our Kids, testified that she received the medical records from Mississippi; however, the medical records did not give her much information. The report reflected that there were no findings regarding sexual abuse; however, Ms. Ross explained that it is "very common" for medical examinations to yield no findings for a variety of reasons. She explained that children may not understand their genitalia and may not be able to explain where and how they were touched. Also, a child who had been sexually abused and even raped will not always exhibit physical signs in their genitalia reflecting that they were abused because the hymenal tissues "change dramatically" during puberty. Moreover, the hymenal tissue is "terribly resilient" and may not tear when the vagina is penetrated. The tissues may "heal without any kind of residual" signs a nurse may be able to detect.

She conducted her own medical examination of A.G. on November 14, 2005,[5] because the documentation available to her was inadequate. In her examination, she found that A.G. had not started her menstrual cycle but was "pubital in a lot of other respects." A.G.'s hymen was "estrogenized" or "thicker," meaning that there was a "lot of hymenal tissue" that moved "around very easily." A.G. also had a "very large hymenal opening" and two clefts in her hymenal opening. She was unable to definitively determine whether the clefts were indicative of trauma or were simply a "normal variant" for A.G. One of the clefts was "problematic" because studies suggest that clefts in that area are indicative of penetrating trauma. A.G.'s anal examination reflected that she had an "acute fissure." However, this was most likely the result of a "stooling phenomena." Ms. Ross also noted that A.G. had a "little bump, or flap . . . on her labia." This bump was most likely a pimple, and after receiving the results from the sexually transmitted disease testing, she determined that the bump was not indicative of sexual trauma. Ms. Ross reiterated that it would be possible for A.G. to have suffered sexual trauma without exhibiting any specific signs of trauma.

On cross-examination, Ms. Ross admitted that there were no "clear incontrovertible findings" to support that A.G. underwent sexual trauma. She stated that the anal fissure could have been related to sexual trauma but was more than likely a stooling phenomenon given the fact that A.G. did not report that the Defendant had recently sexually abused her in that area. She admitted that the report from Mississippi indicated that A.G. had not been "penetrated in her anus by the [D]efendant's . . . penis."

---

[5]A.G. was 11 years old.

At the close of the State's proof, the State dismissed two counts of aggravated sexual battery and one count of attempted rape of a child. The State also elected, based on the victim's testimony, 11 incidents to fit 11 counts of rape.

The Defendant presented several witnesses for his case-in-chief. The Defendant testified first and denied ever raping or doing anything sexual to the victim. He stated that he lived in the house on Brickmont Drive for two years, from 2003 until 2005, and that his cousin, Winston Jones, lived with him and his wife until the Defendant moved to Lavergne, Tennessee.

While they lived in the house on Brickmont Drive, the victim and C.B. stayed with them on Fridays and Saturdays. He denied ever spending time alone with the victim. He also insisted that his wife bought the vibrator after the allegations of sexual abuse surfaced. The Defendant admitted that he called Dorothy Anderson when he heard about the allegations of sexual abuse. However, he admitted that he and his wife called the victim a few times from his cellular telephone while he was driving for work. He said that they called to "talk to her after school" and see how she was doing in school.

On cross-examination, the Defendant insisted again that he was never alone with the victim and that she was only at their house twice a week. When confronted with the victim's knowledge of the vibrator, the Defendant stated that there was more than one vibrator in the house and that he only knew of the one that his wife bought in Ohio. He did not know how the victim was able to describe either vibrator – there was a pink and clear vibrator and a pink and red vibrator. He did not buy the vibrators, and he never saw the pink and red vibrator.

Lekecia Anderson testified that when she first moved to Tennessee, she lived with the Defendant and his wife for two weeks. She then moved into a duplex apartment, where Ferrah Brown lived next door to her in the other apartment. While Lekecia Anderson was working, Ferrah Brown watched her four children. While Ferrah Brown was working, Lekecia Anderson watched Ferrah Brown's three children. Through this arrangement, Lekecia Anderson became close to A.G. and even asked if A.G. had been sexually abused. They had this conversation "right before" A.G. moved to Mississippi. After this conversation, she received a message from Dorothy Anderson regarding the Defendant and A.G. The message indicated that the Defendant may have been "messing with" the victim. On cross-examination, she stated that she asked the victim if she was being abused because she noticed that the victim had "anger issues." She said the victim answered, "[N]o" in response to her questions.

-10-

Patricia Brown stated that they lived at the house on Brickmont Drive for one year and eight months and that they moved to that house in August 2003 and moved out in March 2005. She stated that she, the Defendant, and Mr. Jones lived in the house. After leaving the house on Brickmont Drive, they stayed with Lekecia Anderson for three weeks before moving to Lavergne. She frequently traveled with the Defendant when he went on trips for work, and the victim and C.B. rode with them approximately six times. The Defendant never took the victim on any trips alone because the company prohibited children from riding with drivers without another adult present. Additionally, she never saw the Defendant touch or harm the victim, and she never fought with the Defendant in front of the children. She bought the vibrator in 2005 while she and the Defendant were traveling in Ohio.

Patricia Brown testified that she and the Defendant moved and then the Browns followed shortly thereafter. She also insisted that the Defendant was never alone with the children because either she or Mr. Jones was present. She insisted that when the children stayed on the weekends, she was always there and never left them alone.

The defense rested, and the State presented Detective Robert Carrigan as a rebuttal witness. Detective Carrigan testified that records from the Nashville Electric Service reflected that the Browns turned on their power at their residence before the Defendant turned on the power at his residence. This indicated that each time the Browns moved, the Defendant moved to a nearby location shortly thereafter. He was unable to find any indication that the Browns moved after the Defendant moved.

Detective Carrigan also subpoenaed records from the Defendant and Patricia Brown's cellular telephone company for the period of July 22 - August 3. These records indicated that the Defendant called Eboni Anderson's telephone on July 27, July 28, July 29, July 30, July 31 and that he called Dorothy Anderson's telephone on July 31 and August 3. From August 4 until August 15, neither the Defendant's nor Patricia Brown's phone was used. None of the records indicated that Patricia Brown called Eboni or Dorothy Anderson.

ANALYSIS

I. Sufficiency

The Defendant contends that the evidence was insufficient to sustain his convictions of rape of a child in counts 13 and 14. The Defendant contends that the State did not establish penetration for count 13, charging anal rape, when the victim told the social worker that the Defendant's penis did not go in but then testified at trial that the Defendant's penis "went in a little." The Defendant contends that the State did not establish penetration for count 14 because the vibrator was not used to penetrate the victim's vagina. The State

responds that the statute does not require full penetration and that the victim's testimony that the Defendant's penis "went in a little" was sufficient to sustain his conviction of count 13. The State also responds that the jury could have found that the vibrator penetrated her genital area and that the vagina need not be entered, only a slight intrusion was necessary to sustain his conviction of count 14.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522. The Tennessee Code Annotated defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7) (emphasis added). We will discuss each contested count in turn.

As to count 13 of child rape, A.G. testified that the Defendant's penis penetrated her anus "a little bit" but told Ms. Dupree that the Defendant's penis "touched her butt but it didn't get in." A.G. also testified that it hurt when the Defendant attempted to penetrate her anus with his penis. We note that any intrusion, "however slight," is sufficient to sustain a conviction; therefore, we conclude that the evidence was sufficient to support a conviction of count 13 of child rape.

As to count 14 of child rape, A.G. testified that the Defendant never placed the vibrator in her vagina but that he placed a vibrator on her "feeling thing." The trial court, the State, and defense counsel agreed that the victim was most likely referring to her clitoris. At the close of the State's proof, the Defendant argued that the evidence presented regarding the vibrator was not sufficient to sustain a charge of child rape. The State responded that placing the vibrator on the victim's clitoris could be considered as penetration of the victim's "internal genital structures." The State also requested that the language be corrected in the indictment to accurately reflect the statute in regard to penetration by changing the reference to the "victim's vagina" to the "victim's genital." In denying the Defendant's motion for judgment of acquittal on that count, the trial court stated that the jury could believe that placing the vibrator on the victim's genital area fulfills the requirement of penetration.

When penetration of a female victim is accomplished by any act other than by one of the statutorily described sexual acts, the statute requires that the genital or anal opening of the victim be slightly intruded. Tenn. Code Ann. § 39-13-501(7). However, the statute does not require that the "vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient." State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting Hart v. State, 21 S.W.3d 901, 905 (Tenn. 2000)). A.G. testified that the Defendant put the vibrator on her "feeling thing" or clitoris. Any intrusion of the vulva or labia, "however slight," is sufficient to sustain a conviction; therefore, we conclude that the evidence was sufficient to support a conviction of count 14 of child rape.

## II. Double Jeopardy

The Defendant contends that counts 4 and 5 of digital penetration occurred simultaneously with counts 1 through 3 of vaginal penetration and that sustaining convictions on all counts would violate the principles of double jeopardy because the victim testified that the Defendant penetrated her with his finger right before he penetrated her with his penis. The State responds that the Defendant is limited to plain error review of this issue because he did not raise this issue at trial. The State also responds that these convictions do not violate the principles of double jeopardy because the digital penetration was not used to facilitate the penile penetration.

We agree that the Defendant's double jeopardy issue was not raised at trial or in the Defendant's motion for new trial. Such an allegation, if meritorious, would result in a dismissal of the prosecution. Therefore, we conclude that the Defendant's failure to include this issue in his motion for new trial does not result in a waiver of the issue on appeal. See Tenn. R. App. P. 3(e); State v. Williams, 675 S.W.2d 499, 501 (Tenn. Crim. App. 1984).

The United States and Tennessee constitutions both contain double jeopardy clauses which provide that no person shall twice be put in jeopardy of life or limb for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. Similarly, when a defendant is charged with a sexual offense, the defendant may not be convicted of two offenses when the conduct underlying one offense was "directly facilitative, and thus incidental, or merely preparatory in the sense of intending to arouse the victim or perpetrator" for the commission of the second offense. State v. Barney, 986 S.W.2d 545, 548 (Tenn. 1999). As relevant to this case, the supreme court has suggested several factors "[f]or determining whether two or more sexual acts may be the subject of separate convictions." Id. These factors are:

1. temporal proximity - the greater the interval between the acts, the more likely the acts are separate;
2. spatial proximity - movement or re-positioning tends to suggest separate acts;
3. occurrence of an intervening act - an interruption tends to suggest separate acts;
4. sequence of the acts - serial penetration of different orifices as distinguished from repeated penetrations of the same orifice tends to suggest separate offenses; and
5. the defendant's intent as evidenced by conduct and statements.

Id. at 548-49. In Barney, the defendant was convicted of separate offenses for rubbing the victim's penis with his hand and subsequently performing fellatio on the victim. Id. at 549. The supreme court held that the two sexual acts merited separate convictions. Id. at 549.

The Defendant urges us to analogize this case with the case of State v. Arnett, 49 S.W.3d 250, 256 (Tenn. 2001). In Arnett, the supreme court upheld this court's conclusion that a separate conviction for digital penetration violated the principles of double jeopardy when the defendant digitally penetrated the victim in order to facilitate his subsequent penile penetration. Arnett, 49 S.W.3d at 256. The victim in Arnett was brutally raped on one occasion, and the defendant only digitally penetrated the victim when he was unable to insert his penis into her vagina on his first attempt. Id. In this case, on two separate occasions, the Defendant also digitally penetrated the victim before inserting his penis into her vagina. However, on eight of the ten instances of penile penetration, no digital penetration occurred.

Moreover, consideration of the factors submitted in Barney suggest that the Defendant's convictions should be upheld. We agree that the temporal and spatial proximity between the two acts was not particularly great and that the Defendant did not penetrate different orifices. However, he used a different body part for each penetration. Relative to the Defendant's intent, the testimony at trial suggested that the Defendant intended to violate

-14-

the victim on a regular basis in a variety of ways – the Defendant forced the Defendant to participate in sexual intercourse, fellatio, anal sex, digital penetration, and clitoral stimulation with a vibrator. Thus, we do not believe that the digital penetration was used to facilitate the penile penetration because the digital penetration was simply one of the ways in which the Defendant intended to violate the victim. Accordingly, we conclude that the Defendant's convictions do not violate the principles of double jeopardy.

## III.  404(b) Evidence

The Defendant contends that evidence regarding other instances of sexual conduct between the Defendant and the victim should not have been admitted because most of the erroneously admitted instances of sexual conduct occurred outside of the time period alleged in the indictment. The Defendant also contends that the testimony regarding the instances of sexual conduct that occurred in the truck within the time period of the indictment should have been excluded because the probative value of the testimony was outweighed by the prejudicial effect. The State responds that admission of testimony regarding the instances of sexual conduct occurring within the time period of the indictment was not error but concedes that it was harmless error to admit testimony regarding the instances of sexual conduct that occurred outside the time period of the indictment.

The State provided notice that they wished to submit evidence regarding other acts by the Defendant against A.G, and the trial court held a hearing to determine the admissibility of such evidence. At the hearing, A.G.[6] testified regarding events occurring in the Defendant's trailer (Wilson County), in a residence on "Brick Church Pike"[7] (the indicted offenses that occurred in Davidson County), and in the Defendant's semi-trailer truck (in varying jurisdictions). Her testimony was consistent with her testimony at trial. In addition, A.G. stated that she was abused in the truck when she was 10 and 11 years old.

Ferrah Melissa Brown, A.G.'s mother, also testified at the hearing. She gave a summary of their moving history and stated that the Defendant frequently moved with her family or to a place nearby her family on several occasions. On cross-examination, Ferrah Brown testified that they moved to the trailer park in Wilson County in 2001 and that the victim would have been approximately seven years old at that time.

---

[6]A.G. was 12 years old at the time of this hearing.

[7]From the testimony presented at trial, it is clear that the victim was referring to the Defendant's house on Brickmont Drive.

Following argument by the State and defense counsel, the trial court entered a written order finding "by clear and convincing evidence that [the events in Wilson County and in the Defendant's truck occurred and that] the events [were] material to the issue of intent and the dynamics of the relationship." The trial court noted that the probative value of the sexual activity was not outweighed by the prejudicial effect of such evidence. Relative to the testimony regarding the sexual activity that occurred within the time-frame of the indictment, albeit in a tractor-trailer or semi truck outside Davidson County, the trial court stated that the "events place the indicted offenses in context and are material to the issues of intent and the relationship of the [D]efendant with this alleged victim." The court also noted that A.G. was a credible witness.

On the first day of trial, the State sought to include testimony relative to the sexual abuse that occurred in Rutherford County (Lavergne, Tennessee) after the time period alleged in the indictment. The State noted that the indictment alleged that the abuse occurred from July 2003 until March 2005. However, the Defendant did not move to Rutherford County until March 2005. The State argued that exclusion of this testimony would create a "conceptual gap" in the victim's testimony and cause confusion in the minds of the jury as to why the victim chose to disclose the abuse several months after the Defendant stopped abusing her. Additionally, evidence deemed admissible by the court was recovered from the house in Rutherford County.

A.G. testified relative to these allegations at a jury-out hearing. A.G. said that prior to moving to Mississippi, she visited the Defendant at his house in Rutherford County. When she visited the Defendant, he forced her to watch pornography. The Defendant also placed the red vibrator "on [her]" private parts. On cross-examination, she stated that this occurred "some months" before she moved to Mississippi. She said the Defendant had sexually penetrated her in the upstairs bedroom when she visited the Defendant approximately one week after he moved to Rutherford County. After this episode, the Defendant frequently picked up A.G. and her brothers, brought them to his house, and had sex with A.G.

Following argument by the State and defense counsel, the trial court found that the evidence of sexual abuse in Rutherford County was clear and convincing and that it was not overly prejudicial. The trial court further stated that the testimony "explain[ed] the relationship . . . between the alleged victim and the [D]efendant up until the pertinent point that [A.G.] disclose[d]." The trial court also stated that the doctrine of "fresh complaint" also supported his decision to admit the testimony. However, the trial court precluded any testimony relating to the Defendant showing A.G. pornographic movies.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. Tenn. R. Evid.

-16-

404(b). The rule excluding such irrelevant and prejudicial evidence "is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994) (citing Anderson v. State, 56 S.W.2d 731 (1933)). The danger of such activity "particularly exists when the conduct or acts are similar to the crimes on trial." Id. (citing State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985)).

Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. State v. Tolliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). While the supreme court explicitly declined to recognize a general "sex crimes" exception to Rule 404(b), the court did create a narrow exception "in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." Rickman, 876 S.W.2d at 828-29. In such cases, evidence of other sex crimes is admissible "when an indictment is not time specific and when evidence relates to sex crimes that allegedly occurred during the time as charged in the indictment." Id. Additionally, "the State must elect at the close of its proof-in-chief as to the particular incident for which a conviction is being sought." Id. at 829.

In declining to adopt a general "sex crimes" exception, the supreme court noted that "evidence admitted under a general sex crimes exception is said to be for purposes of corroboration, or to show the intimate relations between the parties, or to show that the defendant had a lustful disposition." Id. at 828. These exceptions were not embodied in the Tennessee Rules of Evidence and were specifically rejected in the supreme court's opinion in Rickman. Id. at 829-30; see State v. Otis Breeden, 03-C0L-93L0-CR00335, 1995 WL 390952 (Tenn. Crim. App. 1995) (reversing the defendant's convictions following the supreme court's decision in Rickman and concluding that evidence of prior sexual acts was inadmissible to show the state of intimacy between the victim and the defendant). Accordingly, we conclude that it was error for the trial court to admit the evidence of the prior sexual activity between the Defendant and the victim in order to explain the "dynamics of the relationship." The trial court also erred in relying on the doctrine of fresh complaint because that doctrine "allows others to testify to statements made by the victim about the sexual assault for which the defendant is then being prosecuted in order to corroborate the victim's statement that he or she suffered the attack." Rickman, 876 S.W.2d at 830; see also State v. Livingston, 907 S.W.2d 392, 395 (Tenn. 1995) (stating that "no acceptable basis exists for stretching the fresh-complaint doctrine to the extent that it is applicable to cases involving child victims").

In this case, the victim and C.B. testified about acts for which the Defendant was not being prosecuted. The indictments in this case alleged a time frame of abuse occurring in Davidson County between July 25, 2003 and March 17, 2005 but was not otherwise time-specific. In this time frame, the victim was between eight and ten years old.

First, we must note that any evidence of abuse that did not occur in Davidson County should have been excluded because these offenses could not be elected as offenses for this indictment when the offenses occurred outside the trial court's jurisdiction. See id. at 829. (requiring the State to elect the incident for which a conviction is being sought when testimony regarding additional sexual offenses is admitted into evidence). Moreover, the abuse that occurred in Wilson and Rutherford counties did not occur within the time period of the indictment. According to the testimony presented at trial, the victim was either five or seven years old when she was abused in Wilson County. The abuse that occurred in Rutherford County was also outside of the period alleged in the indictments because the Defendant moved to Lavergne in March 2005. Some of the abuse that occurred in the Defendant's truck may have occurred within the time period alleged in the indictment because the victim testified that she was 10 and 11 years old when the Defendant abused her in the truck. The victim turned 11 on September 11, 2005. The abuse that occurred in the truck occurred outside Davidson County, precluding an election by the State to base a conviction on the incidents in the truck. Therefore, any testimony regarding the abuse in the truck should not have been admitted. Accordingly, we conclude that the trial court erred in admitting evidence relating to the abuse that occurred in Wilson County, in Rutherford County, and in the truck. However, this conclusion does not end our inquiry.

The Tennessee Rules of Appellate Procedure provide for harmless error review in such cases. See Tenn. R. App. P. 36(b). The United States Supreme Court has also "repeatedly recognized" that "most constitutional errors can be harmless." Washington v. Recuenco, 548 U.S. 212 (2006) (citing Neder v. United States, 527 U.S. 1, 8 (1999) (quoting Arizona v. Fulminante, 499 U.S. 279, 306 (1991))). However, "[a]ll errors are not the same, nor do they have the same effect on the judicial process in general or on a particular trial." State v. Edwardo Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Accordingly, our supreme court "has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error." Id. As relevant to this issue, our supreme court has noted that "errors in the admission of evidence do not normally take on constitutional dimensions." Id. at 375 (citing State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003)).

In determining whether non-constitutional errors are harmless, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to

the judicial process.'" Id. at 372 (quoting Tenn. R. App. P. 36(b)). While substantial evidence of the defendant's guilt makes it difficult for "the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial," harmless error inquiry "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict [wa]s correct." Id. at 372. Rather, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision making." Id.

In Rickman, the supreme court held that testimony relating to the defendant's prior sexual activity with his stepdaughter when she was seven or eight years old was inadmissible and that the prejudice of the testimony outweighed the probative value of the evidence when the defendant was on trial for acts committed with his stepdaughter that occurred years later. Rickman, 876 S.W.2d at 826-30. In a somewhat similar case, the supreme court held that erroneously admitted corroborating testimony provided by the victim's cousin was not harmless. State v. Dutton, 896 S.W.2d 114, 117 (Tenn. 1995). In Dutton, the victim's cousin testified that he observed sexual activity between the defendant and the victim on a prior occasion before the indictment period. Id. at 115. The testimony of the 12-year-old victim was the "primary evidence" of the sexual abuse presented at trial. Id. at 117. In deciding that the error was not harmless, the supreme court stated, "Under these circumstances, there is little doubt that the trial court error in admitting the testimony of [the 14-year-old cousin] as to prior sex acts between the defendant and the victim 'more probably than not affected the judgment in this case.'" Id.

Relative to this Defendant's case, we acknowledge that the trial court issued a limiting instruction to the jury regarding the erroneously admitted portions of the victim's testimony. However, the trial court instructed the jury that they may only use the evidence of other allegations of abuse

> for the limited purpose of describing to you a complete account of the events in establishing the relationship between [A.G.] and [the Defendant], and/or the [D]efendant's intent for which the crimes he - - the allegations for which he is currently on trial.

As discussed above, the trial court was precluded from admitting evidence to describe the relationship between the victim and the Defendant. "Accordingly, because the instructions were incorrect and misleading, they may not be considered in our analysis of whether the error in the admission of the improper evidence was harmless." Id.

In determining whether the admission of the evidence was harmless in this case, we first note that, similar to the testimony presented in the Dutton case, A.G.'s testimony was

-19-

the primary evidence presented that supported her allegations of sexual abuse by the Defendant. The Defendant denied ever touching or being alone with the victim. C.B.'s testimony served to corroborate the victim's testimony regarding the years of abuse. C.B. testified at length and with the aid of stuffed animals about the unindicted offenses. Additionally, the erroneously admitted testimony from A.G. allowed the jury to infer that the Defendant had been abusing the victim several years prior to the indicted offenses and after the indicted offenses. Accordingly, we believe that the erroneously-admitted portions of testimony from the victim and C.B. prejudiced the Defendant and affirmatively affected the result of the trial on the merits. We reverse the judgments of the trial court and remand the Defendant's case for a new trial.

## IV. Remaining Issues

While we have concluded that the Defendant is entitled to a new trial, we will discuss the Defendant's remaining issues in the event that further appellate review occurs and to provide guidance to the trial court because two of the remaining issues relate to evidentiary matters. We will also discuss the Defendant's sentencing issues in the event of a subsequent conviction and sentencing hearing following our remand of the Defendant's case.

### 1. Pregnancy

The Defendant contends that defense counsel should have been allowed to ask the victim about a pregnancy that occurred after the time period of the abuse because the victim's testimony regarding the Orajel and the vibrator being placed on her "feeling place" demonstrated that she had knowledge of sexual matters that could have come from another source. Also, the Defendant contends that with this knowledge, the victim should have been able to refer to her "feeling place" as her clitoris. The State responds that the victim's subsequent pregnancy was not relevant to her knowledge of sexual matters prior to the Defendant's abuse. Furthermore, the victim's sexual relationship with a 14-year-old boy when she was 13 did not establish that she should have known that her "feeling place" was really her clitoris.

Evidence of a victim's sexual behavior with a person other than the Defendant is generally inadmissible unless it is offered to "prove or explain" the victim's "knowledge of sexual matters." Tenn. R. Evid. 412(c)(4)(ii). Additionally, the "probative value of the evidence [must] outweigh[] its unfair prejudice to the victim." Tenn. R. Evid. 412(d)(4). Such evidence is only admissible if defense counsel files a motion regarding the introduction of this evidence ten days before trial. Tenn. R. Evid. 412(d)(1)(i). The ten-day filing requirement may be waived "if the court determines either that the evidence is newly

discovered and could not have been obtained earlier through the exercise of due diligence or that the issue to which the evidence relates has newly arisen in the case." Id.

We first note that defense counsel did not comply with the ten-day notice requirement. The Defendant contends that the evidence of the victim's sexual behavior was not relevant until the victim testified at trial about the use of Orajel and referred to her clitoris as her "feeling place." The State responds that defense counsel knew about the pregnancy prior to the start of the trial and that defense counsel did not provide the appropriate pretrial notice regarding this evidence. Following argument by counsel, the trial court stated that defense counsel knew that the victim was pregnant prior to trial and was aware that the Defendant used a "gel-type substance" and a vibrator on the victim. The trial court further stated that the motion should have been raised prior to trial and that the victim's testimony regarding the Orajel and her clitoris did not "suddenly" make her knowledge of sexual matters relevant.

Evidence that the victim became pregnant after a sexual encounter with a 14-year-old boy indicated that the victim engaged in specific instances of sexual behavior with another person. See State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). We also note that the pregnancy and resulting additional sexual knowledge occurred years after her allegations of abuse. Additionally, defense counsel knew about the victim's pregnancy, the accusation that the Defendant used a vibrator on the victim, and the accusation that the Defendant used a "gel-type" substance when having sex with the victim. Accordingly, we conclude that the trial court did not err in finding that defense counsel did not comply with the notice requirement of Tennessee Rule of Evidence 412. See State v. Tommy Dale Taylor, No. W2008-01006-CCA-R3-CD, 2009 WL 1929159, at *10 (Tenn. Crim. App. July 6, 2009), perm. app. denied (Tenn. Nov. 30, 2009).

## 2. Hearsay

The Defendant contends that Lisa Dupree's testimony regarding the victim's statements about the rapes was not for purposes of medical diagnosis and treatment; accordingly, these statements should have been excluded as inadmissible hearsay. The State responds that the statements obtained from the interview were sought and used to provide further treatment for the victim and that this was not an interview conducted for investigative purposes but was an interview conducted for medical diagnosis and treatment.

At trial, Lisa Dupree testified that Our Kids is a "foresenic evaluation unit for children who are alleged to be victims of sexual assault." Her job consists of "collect[ing] a presenting history from [the victim's] parent" and then she conducts a "medical history with the child." Following the interview, she provides "recommendations for follow-up services" and "interventions that may be necessary if there's a crisis in the family" or "if there's other

-21-

needs, psycho social or psychological needs." She collects a medical history "for purposes of the medical examiner, the medical diagnosis and treatment, so that [they] can make decisions with respect to testing for infections or evidence collection." Her questions are "designed to elicit information that will help guide testing for infections or diseases" and determining which "body parts [they] may need to swab or look at." The information is also gathered to ensure that they comply with "reporting statutes" so that they know which authorities they need to notify. They also must notify the health department if they find that a child has been infected with a sexually transmitted disease. She seeks to identify the perpetrator in order to protect the child and ensure that they report the contact to the authorities "for investigative and protection issues." There are also medical reasons for identifying the perpetrator. The age, gender, race, and relationship of the perpetrator allow them to assess the child's risk for sexually transmitted diseases.

After hearing this testimony from the witness, the trial court sent the jury out of the room before hearing argument from the State and defense counsel concerning the admissibility of the victim's statements to Ms. Dupree. In denying the defense motion, the trial court noted that the statement was taken for purposes of "follow-up medical treatment" and that the statements qualified under the hearsay exception. Furthermore, the statements were taken to ensure that the victim was protected from the Defendant by providing information to the victim's mother regarding the identity of the perpetrator, the Defendant, who maintained "continuing contact" with the victim.

The victim's interview with Ms. Dupree was a statement, which is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible unless an exception to the hearsay rule applies. Tenn. R. Evid. 802. Statements made for purposes of medical diagnosis and treatment are one such exception to the hearsay rule. Tenn. R. Evid. 803(4). These statements must either describe "medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." Id. A diagnosis must be "made for the purpose of determining what course of treatment should be prescribed for the patient." State v. Rucker, 847 S.W.2d 512, 517 (Tenn. Crim. App. 1992).

These statements are admissible because patients, in general, have a strong motivation to be truthful because the type of medical care they receive is dependent upon their answers to the questions. State v. McLeod, 937 S.W.2d 867, 870 (Tenn. 1996). In cases in which a child is involved, the rationale underlying the admissibility of these statements does not necessarily apply "because children may not be able to understand the need to be truthful in

a medical setting." Id. Therefore, when children are involved, we "must look to all the circumstances surrounding the statement" in determining whether the statements were admissible. State v. Stinnett, 958 S.W.2d 329 (Tenn. 1997). These circumstances include "the timing of the statement and its contents." McLeod, 937 S.W.2d at 871.

In this case, the victim was taken to Ms. Dupree shortly after her return to Tennessee. She had been examined by a doctor in Mississippi after she alleged that she had been raped repeatedly by the Defendant. However, as noted by several witnesses, the examination in Mississippi was not adequate. The examination in Tennessee was conducted to determine where the victim had been touched and in what manner. The identity of the Defendant was also important in order to determine what type of medical tests were needed and to maintain separation between the victim and the abuser. The separation was particularly important because the victim, her mother, and others testified that the victim spent a significant amount of time with the Defendant at his residence. All of the information collected from the interview was then provided to the examiner in order to facilitate further medical treatment. Additionally, Ms. Dupree's testimony at trial did not indicate that the victim was asked leading questions or guided in her responses. Accordingly, we conclude that the trial court did not err in admitting the victim's statements because they were made for purposes of medical diagnosis and treatment, an exception to the hearsay rule.

### 3. Sentencing

Following a sentencing hearing, the trial court applied two enhancement factors and minimally considered the fact that the Defendant did not have any prior convictions. The trial court rejected the enhancement factor of previous history of criminal convictions or behavior. See Tenn. Code Ann. 40-35-114(1). The trial court applied and placed great weight on the enhancement factor that the Defendant abused a position of private trust because the Defendant was treated as family even though he was not biologically related to the victim and regularly cared for the victim. See Tenn. Code Ann. § 40-35-114(14). The trial court found but placed minimal weight on the enhancement factor that the offense was committed for his desire for pleasure or excitement. See Tenn. Code Ann. § 40-35-114(7).

The trial court then discussed the factors concerning the imposition of consecutive sentencing and noted that the abuse continued "for a period of five years," that the victim was instructed to not tell anyone about the Defendant's abuse, and that the victim sought counseling and had behavioral issues after the abuse. The trial court also noted the extent of the sexual activity between the Defendant and victim and said that "[j]ust about everything [but cunnilingus] did occur with this young child and [the Defendant], according to the proof." Following these findings, the trial court sentenced the Defendant as follows:

| Count | Charge | Disposition & Sentence |
|---|---|---|
| 1 | Child Rape - penile penetration in the Defendant's bedroom | 18 years to serve |
| 2 | Child Rape - penile penetration in the Defendant's bedroom | 18 years to serve; concurrent with count 1 |
| 3 | Child Rape - penile penetration in the Defendant's bedroom | 18 years to serve; concurrent with count 1 |
| 4 | Child Rape - digital penetration in the Defendant's bedroom on Brickmont Drive | 18 years to serve; consecutive to count 1 |
| 5 | Child Rape - digital penetration in the Defendant's bedroom on Brickmont Drive | 18 years to serve; concurrent with count 1 |
| 6 | Child Rape - penile penetration in the Defendant's living room on Brickmont Drive | 18 years to serve; concurrent with count 1 |
| 7 | Child Rape - penile penetration in the Defendant's bathroom on Brickmont Drive | 18 years to serve; concurrent with count 1 |
| 8 | Aggravated Sexual Battery | Dismissed by State |
| 9 | Aggravated Sexual Battery | Dismissed by State |
| 10 | Child Rape - fellatio in the Defendant's bedroom on Brickmont Drive | 18 years to serve; consecutive to count 1 |
| 11 | Child Rape - fellatio in the Defendant's bedroom on Brickmont Drive | 18 years to serve; concurrent with count 1 |
| 12 | Attempted Rape | Dismissed by State |
| 13 | Child Rape - anal penetration in the Defendant's bedroom on Brickmont Drive | 20 years to serve; consecutive to count 1 |
| 14 | Child Rape - clitoral stimulation with a vibrator in the Defendant's bedroom | 20 years to serve; concurrent with count 1 |

The trial court's sentencing decision resulted in an effective sentence of 74 years.

## A. Enhancement Factors

The Defendant contends that the trial court erred in sentencing the Defendant when the enhancement factors cited were not found by a jury, and the Defendant requests this court to reduce the length of his sentences to the "presumptive minimum" of 15 years. The State concedes that the trial court erred in applying enhancement factors that were not found by a jury but asserts that any error was harmless because the Defendant received sentences that were below the presumptive minimum or were in accordance with the presumptive minimum.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994) (citation omitted); see Tenn. Code Ann. § 40-35-210(e).

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the potential for rehabilitation or treatment, and (8) any statistical data provided by the Administrative Office of the Courts regarding sentencing for similar offenses in Tennessee. Tenn. Code Ann. §§

40-35-102, -103, -210 (2006); see also Ashby, 823 S.W.2d at 168; Moss, 727 S.W.2d at 236-37.

The Defendant stands convicted of offenses that all occurred before the 2005 revision to the Criminal Sentencing Reform Act. At the outset, we note that both parties recognize that the trial court's use of enhancement factors not found by a jury violated our supreme court's holding in State v. Gomez, 239 S.W.3d 733 (Tenn. 2007). However, the sentences imposed by the trial court were at or below the presumptive midpoint of the range because the Defendant was sentenced to either 18 years or 20 years for each of his Class A felonies. See Tenn. Code Ann. § 40-35-112(a)(1) (for defendant convicted as a Range I offender, sentence range for Class A felony is 15 to 25 years); See also Tenn. Code Ann. § 40-35-210(c) (2003) (for defendant convicted of a Class A felony, the presumptive sentence is the midpoint of the range unless enhancement or mitigating factors are present). Accordingly, we conclude that the error was harmless.

### B. Consecutive Sentencing

The Defendant contends that the trial court erred in imposing partial consecutive sentences because imposition of the consecutive sentences was not warranted given the facts of the case. The State responds that consecutive sentences were warranted in the Defendant's case given the nature of the abuse suffered by the victim.

Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b), which states, in pertinent part, that the trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that

> [t]he defendant is convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

Tenn. Code Ann. § 40-35-115(b)(5) (2006). The trial court is required to "specifically recite the reasons" behind imposition of a consecutive sentence. See Tenn. R. Crim. P. 32(c)(1); see, e.g., State v. Palmer, 10 S.W.3d 638, 647-48 (Tenn. Crim. App. 1999) (noting the requirements of Rule 32(c)(1) for purposes of consecutive sentencing). As noted above, the trial court discussed the reasons behind his sentencing decision on the record. Following our review, we conclude that the record does not preponderate against the trial court's sentencing

-26-

decision and that the effective sentence imposed was not greater than that deserved for the offenses in this case.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are reversed. The Defendant's case is remanded for a new trial.

_____
D. KELLY THOMAS, JR., JUDGE